GARBER, EXECUTOR, *v.* KING.

[No. 12,305. Filed February 17, 1926. Rehearing denied June 30, 1926. Petition to transfer dismissed June 10, 1930.]

*Harold Taylor, John R. Browne* and *Kealing & Hugg,* for appellant.

*Thomas D. Stevenson, Samuel D. Miller, Frank C. Dailey, William H. Thompson, Albert L. Rabb* and *Perry E. O'Neal,* for appellee.

McMahan, J.—Appellee filed his claim in three paragraphs against the estate of Joseph K. Sharpe. The first paragraph is upon six promissory notes aggregating $18,090, plus interest and attorney's fees. The second paragraph is for the recovery of 603 shares of the capital stock of the Indiana Manufacturing Company, hereafter referred to as "Indiana company." The third paragraph is for two dividends paid since the decedent's death to appellant as executor, on said 603 shares of stock. There was a finding and allowance in favor of appellee on the first and third paragraphs in the sum of $22,673.55, and a finding and judgment against appellee

on the second paragraph. Appellant's motion for a new trial was overruled, and he appealed. The contention here is that the decision of the court is not sustained by sufficient evidence and is contrary to law.

All of said claims grew out of and are founded upon a contract between the decedent and appellee, dated October 5, 1907. This agreement, after reciting that the parties thereto had been acting jointly for the interest of each party in connection with the affairs of said company, that an agreement was in prospect by which the stock of that company would be sold, that appellee was participating in the sale to the extent of selling all his stock, that Sharpe was so situated financially that it would be advantageous to him to enter into the arrangement therein set out, and, in recognition of the fact, that appellee was disposing of his stock without any recognition of the labor and effort he had bestowed in connection with the matter, and whereas appellee had a certificate for 250 shares of the stock which had been lost or mislaid, so that he was not able to deliver it with his other certificates, the parties agreed as follows: That appellee would sell 250 shares of such stock to Sharpe (and give bond to secure the issuing of a certificate to Sharpe) for $40 per share, payable "from and as dividends may be received thereon," such shares to be conveyed on their back, but not transferred on the books of the company, so that appellee would still hold them under the agreement, it being agreed and understood that, after appellee had received $40 in dividends on each share, the dividends thereafter should continue to go to appellee in consideration of the further agreement therein and in recognition of the assistance and services of appellee in behalf of Sharpe, and that appellee would receive back from Sharpe a certificate for 250 shares of stock in said company, for which appellee agreed to pay Sharpe $10,000, and that appellee was thereafter to receive all

dividends thereon and any sum for which the stock might thereafter be sold.

The agreement then provides: "That, in further recognition of what has been hereinbefore stated, the said Sharpe agrees that, in connection with the eighteen hundred and ten shares of his remaining stock held by himself and his wife in The Indiana Manufacturing Company, when and after the said Sharpe and wife shall have received Fifty dollars per share thereon in dividends, that, continuously thereafter, the said King shall receive one-third of any and all dividends accruing or being received thereon or any sum received therefor after the payment of the total of Fifty dollars per share, and the same shall be delivered by the said Sharpe and wife to the said King. In the event of any favorable opportunity arising whereby the said Sharpe should desire to sell a portion or all of said stock, the said King shall be privileged to take one-third of the stock so desired to be sold at the same price as the said Sharpe and wife should desire to sell for, or the said King may elect to take any portion based on the above statement that would properly belong to him in excess of the Fifty Dollars as named. And, it is understood and agreed that the said Sharpe can and will carry out this agreement, figured out as on all of the stock herein named, but paid over on and in connection with only that part of the stock which stands in the name of Joseph K. Sharpe, Jr., himself."

In September, 1907, and for some time prior thereto, the Indiana company had been financially embarrassed, the amount of its indebtedness then being more than $250,000. There had been litigation between that company and the J. I. Case Threshing Machine Company, which resulted in a judgment in favor of the Indiana company for about $235,000, and which amount had been impounded in court pending a threatened appeal by the Case company to the Supreme Court of the

United States. Sharpe, who was a director of the Indiana company, and Frank K. Bull, president of the Case company, by appointment, met in Chicago in September, 1907, at which time Bull told Sharpe there was a chance of the Case company being interested in purchasing a controlling interest in the Indiana company. This led to the formation of a syndicate by the officers and directors of the Case company to buy the controlling interest in the Indiana company. In the conversation between Bull and Sharpe, the former assured the latter that he would be taken care of in case the control of the company passed into the hands of the proposed syndicate. When or how this matter was called to the attention of appellee is not disclosed by the evidence. The inference, however, is that he learned of it soon after the meeting between Bull and Sharpe, as he became active in the matter, and was largely responsible for getting a sufficient number of the stockholders to agree to sell their stock to the syndicate. October 1, 1907, appellee owned 3,927 of the 15,000 shares of the stock of the Indiana company. Sharpe and his wife owned 2,062.

The contract between appellee and Sharpe stated that appellee was going to dispose of all of his stock to the syndicate. He had mislaid or lost one certificate for 250 shares, and, desiring to have for delivery to the syndicate certificates for the full number of shares then standing in his name, he purchased 250 shares from Sharpe for $10,000 cash. It seems to have been the intention of the parties that appellee should retain title to the 250 shares covered by the lost certificate, and, to that extent, at least, Sharpe knew appellee was not disposing of all stock held by him. As a matter of fact, he retained the 250 shares covered by the lost certificate and 700 additional shares, so that, after the purchase by the syndicate, Sharpe and his wife owned 1,812 shares

of the stock in the Indiana company, and appellee owned 950 shares.

Sharpe was a director of the Indiana company at the time of and prior to the sale of the stock to the syndicate. He continued thereafter to be a director, and was president of that company as late as 1916. Appellee was vice-president and a director of the company during the same time.

On January 12, 1916, nine years after the execution of the contract, Sharpe wrote a letter to appellee inclosing several original promissory notes, dated November 2, 1915, some of which he paid in his lifetime. The six notes here involved are renewals of those which he did not pay. The decedent paid the interest on these notes to August, 1920. In this letter, which was written on stationery of the Indiana company, and which indicated that Sharpe at that time was president of the company and that appellee was vice-president, Sharpe stated he had issued an order that all future payments on 603 shares of the stock should be remitted to appellee, and, appreciating what appellee had done for him and the company, it was his intention to carry out the agreement of October 5, 1907 exactly as agreed upon. And, after referring to that part of the agreement reciting that appellee had made sacrifices for which there had been no recognition, and had performed labor for the benefit of those interested in the company, said the arrangement made with appellee in the agreement was a proper one for him to make. From this letter, it appears that Sharpe had received dividends of $36 a share on the 603 shares which were due appellee under the contract, and that, in addition to the amount of the notes, there was a balance of $537.92 owing appellee, for which Sharpe said he would send a check when he got his stock distribution. Five days later, Lee R. Garber, who was then the secretary of the Indiana company, and acting for Sharpe,

wrote a letter to appellee stating that he inclosed Sharpe's check to cover the $537.92 and $4,221 which Sharpe had that day received on the 603 shares of stock. After the execution of said notes, Sharpe paid appellee by checks over $14,000 for dividends received by him on stock, according to the agreement of October 5, 1907, the last of said checks being dated January 23, 1919.

Appellant contends that the verdict is not sustained by sufficient evidence, and is contrary to law. This contention is based upon the theory that the agreement between appellee and Sharpe, dated October 5, 1907, was without consideration, and that the notes mentioned in the first paragraph of the claim filed herein, and the claim for dividends set out in the third paragraph, being founded on said agreement, are (1) without consideration and (2), if there was any consideration for these claims and said agreement, it was an illegal consideration by way of a secret advantage over appellee's associates in the pool for the sale of the stock of the Indiana company to the syndicate heretofore mentioned.

Sharpe, when the stock held by his wife is included, and appellee were the two largest stockholders, and president and vice-president respectively of the Indiana company, which was financially embarrassed; $197,000 of its debts would be due in a few months. It seems that Sharpe and appellee had the burden of financing the company by borrowing money in order to keep it a going concern. The credit of the company apparently was exhausted, and something had to be done. The situation was serious. It had recovered a judgment against the Case company for about $235,000, but this money was impounded pending a threatened appeal to the Supreme Court of the United States. Early in September, Sharpe invited Bull, the president of the Case company, to come to Indianapolis. They compromised and met in Chicago. It was at this

meeting that the first talk of the Case company's buying a controlling interest in the Indiana company occurred. This sale, if consummated, would at once relieve the Indiana company from its financial embarrassment. The officers of the Case company were friendly to Sharpe. Bull had assured him that he would be taken care of if the sale was made. Sharpe evidently was desirous that the Case company should have a controlling interest in the Indiana company. King apparently was the one man on whom the Indiana company and its officers depended for financial assistance. The company was then owing him $32,000. He learned of the proposal of the president of the Case company to buy the control of the Indiana company. He became interested, and apparently undertook the task of forming a pool and securing sufficient stock to be placed in escrow at $40 a share, so as to pass the control to the Case company. With prospects of the sale being accomplished, Sharpe and appellee entered into the agreement in question, the opening sentence of which stated that: "Whereas, Theophilus King and Joseph K. Sharpe, Jr., having been acting jointly and for the interest of each and both in connection with the affairs of the Indiana Manufacturing Company of Indianapolis, Indiana; And Whereas, an agreement is in prospect by which a sale of stock of the Indiana Manufacturing Company will be effected; And Whereas, the said King is participating in the sale to the extent of disposing of all of his stock in connection therewith; And Whereas, the said Sharpe is so situated in his financial affairs that it would be advantageous to him to enter into the following arrangement, and also in recognition of the fact that the said King has felt it necessary to dispose of all of his stock and necessarily without any recognition in connection with all the labor and effort which he has bestowed in connection with the matter." The pool had not yet been formed. The necessary stock had not

been placed in escrow. The sale had not been completed. If it was not completed, the result might have been disastrous to the Indiana company. If completed, that company would be freed from threatened financial disaster. Sharpe would retain his holding in the company, would be taken care of by those purchasing the control, and, as was then understood, would be the president of the company after the reorganization. His financial situation was such that he believed it would be to his advantage to enter into the arrangements with appellee, as set out in the agreement, the carrying out of which would aid appellee in the formation of the pool and the sale to the syndicate, a transaction which Sharpe believed would be to his advantage. By this agreement, he agreed to sell 250 shares of his stock to appellee, for which the latter agreed to pay him $10,000 in cash. There was, without question, ample consideration for the execution of the contract. We cannot agree with appellant that whatever consideration there was, was a past consideration.

Appellant next argues that there was a confidential relation existing between Sharpe and appellee, and that appellee was bound to disclose to Sharpe all the facts concerning the several transactions in relation to the Indiana company, and not to conceal anything material to any bargain he might make in relation thereto whereby he would get an advantage over Sharpe. The unfair advantage asserted by appellant is that appellee negotiated the pool arrangement with other stockholders to sell not less than 8,500 shares, including all of his stock, to a syndicate for $40 a share, and then induced Sharpe to enter into the above-mentioned contract, whereby appellant says appellee made a secret profit over his associates who sold to the syndicate, and that, in order to induce Sharpe "to enter into said contract, represented to him that appellee was selling all of his stock to the

syndicate 'without any recognition in connection with all of his labor and effort which he has bestowed in connection with the matter,' and caused appellant's decedent to believe that appellee was doing these things at a sacrifice to himself, when, in truth and in fact, appellee was reserving 950 shares of his said stock and selling the balance voluntarily to better his financial condition in relation to all of said matter." Appellant emphasizes the statement in the first part of the contract that appellee was "participating in the sale to the extent of all of his stock," and says that Sharpe, relying upon that statement, executed the said contract, when, in fact, appellee did not sell all of his stock, but retained 950 shares, without the knowledge of Sharpe, in violation of the confidential relationship existing between them.

Whatever may have been the understanding of the parties when they entered into this contract as to the reason why appellee desired to buy 250 shares of stock from Sharpe, it is clear that it was their intention and understanding that the 250 shares represented by the lost certificate was not to be sold to the syndicate. The inference to be drawn is that these shares were to remain the property of appellee. Appellant makes no claim that the ownership of these shares was to pass to his decedent. When Sharpe signed this contract, he knew appellee was going to retain at least 250 shares of the stock. Appellant was secretary of the Indiana company, and had been in its employ since 1897. In 1907, and thereafter, he appears to have been very closely and intimately associated with Sharpe. He kept his books, made out his checks, and, in a general way, looked after his accounts and banking business. The evidence does not disclose much concerning the relationship between Sharpe and appellee after the purchase of the control of the company by the syndicate in 1907. The inference is that they both continued as

directors of that institution, one as president and the other as vice-president of the board of directors. The company evidently prospered, and the relationship between the men continued to be friendly, as, on January 12, 1916, Sharpe wrote to appellee the letter heretofore referred to, addressing him as "Dear Mr. King," and inclosing promissory notes aggregating $21,170.08, which he says was the amount he was owing appellee according to a calculation made by appellee, but which Sharpe said was, according to a calculation made by appellant, $537.92 less than the actual amount owing appellee under the agreement, which latter amount he said he would send when he got his stock distribution, evidently referring to a dividend which he expected to be declared soon thereafter. Five days later, appellant, Lee R. Garber, wrote his letter to appellee, which he says was written at the request of Sharpe, and, in which, he says that, to carry out the agreement of October, 1907, he was inclosing a check for $4,758.92 to cover the $537.92 due appellee and a dividend that day received on 603 shares of the stock. In July, 1916, January and July, 1917, January and September, 1918, and January, 1919, Sharpe personally drew and sent appellee checks aggregating $9,346 for dividends received after January, 1916. Appellant makes no claim that Sharpe did not know that appellee did not turn all of his stock over to the syndicate, or that he did not, during all the time thereafter, know that appellee continued thereafter to hold 950 shares of the stock. In view of the business relationship these men bore to each other and to the company, one president, one vice-president, and appellant secretary of the company, and the private secretary, as it were, to Sharpe, such a contention would seem to be without foundation. No man of the business capacity of Sharpe could, under the facts of this case, be president of such a company for at least 12 years and not know that the

vice-president and director of that company was a stockholder and not know the amount of stock held by him. And we hold appellant is in no position to claim his decedent executed the notes and made the several payments to appellee in reliance upon the statement in the contract of 1907 that appellee was disposing of *all* his stock in the company.

Appellant offered to introduce evidence tending to show that appellee had entered into an agreement with the syndicate purchasing the control of the Indiana company, by virtue of which he got a secret profit of about $2 a share on each share of stock purchased by the syndicate. An objection to the introduction of this evidence was sustained. Appellant says the offered evidence tended to show that appellee was in a position of trust towards his associates in the pool, and that he had not disclosed to them that he was getting an additional or secret advantage over them in the sale of the stock to the syndicate. In considering this contention, it is to be remembered that Sharpe was not a member of the pool, and was selling none of his stock to the syndicate. And there is no claim or contention that appellee concealed anything from Sharpe or that the latter was not fully advised before he executed the notes in question. It might be that, where parties bear confidential or fiduciary relations to each other, a contract secured by one from the other without a full disclosure of the material facts, and where an advantage was thus obtained over the other, would not be enforceable. But there is nothing in the record to show that appellee concealed anything from the decedent, or that the latter was not fully advised, or that appellee obtained an advantage over the decedent. Appellant contends that the expression in the contract that appellee was selling all of his stock to the syndicate "without any

recognition in connection with all of his labor and effort which he has bestowed in connection with the matter," caused Sharpe to believe that appellee was selling all his stock at a sacrifice, when, in fact, he was reserving 950 shares and selling the balance voluntarily to better his financial condition, and that the contract and notes were void and not supported by a legal consideration. If appellant's decedent had been a member of the pool, there might be some force in this contention. But, under the record now before us, we hold there was no error in excluding the offered evidence.

The judgment is, therefore, affirmed.

## ON PETITION FOR REHEARING.

McMahan, P. J.—Appellant, in support of his petition for a rehearing, says we erred: (1) In stating the facts concerning the formation of the pool; (2) in holding there was a sufficient consideration for the notes; (3) in holding there was no error in excluding evidence; and (4) in failing to consider his contention that the contract of October 5, 1907, gave appellee a secret advantage over his cotrustees and associates in the pool, for which reason he says the contract was void on the grounds of public policy. In so far as the first and second contentions are concerned, we are satisfied with the principal opinion as it now stands. In view of the fact that appellee in his original brief called attention to the fact that no question concerning the action of the court in refusing to admit the offered evidence, or in striking out evidence, was presented, and, in view of appellant's present contention, we withdraw all that we said in the original opinion on these questions, and hold that no question is presented concerning the exclusion or the striking out of such evidence, and that there is nothing in the record showing that the contract or the

notes are illegal and unenforceable on the ground of public policy.

Rehearing denied.